UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ANTHONY R. MEGLINO,

                                        Plaintiff,

        v.                                                      5:06-CV-968
                                                                (FJS/GJD)
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

ANTHONY R. MEGLINO, Plaintiff, *Pro Se*
VERNON NORWOOD, Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## PROCEDURAL HISTORY

Plaintiff filed his first application for disability insurance benefits on December 9, 1998.  (Administrative Transcript ("T."), 97-99).  At that time, plaintiff alleged disability due to back problems, a left shoulder injury, lower intestinal problems, right hand pain, and depression.  (T. 35-37, 43).  The claim was denied by an Administrative Law Judge in a decision dated April 14, 1999.  (T. 40-43).  Plaintiff did not appeal that April 14, 1999 denial of benefits.

The present application for disability insurance benefits was filed on May 9,

2003, alleging disability beginning November 19, 1993.[1]  (T. 109-11).  In his present application, plaintiff alleges disability based on his back injury, a severe colon condition, as well as depression and other mental impairments.[2]  (T. 170, 718-33). The application was initially denied.[3]  (T. 38, 44-47).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was started on December 13, 2004 (T. 690-702), and continued on February 14, 2005 in order to allow plaintiff to obtain counsel.  (T. 702-38).  At the hearing, plaintiff was the only witness to testify.  (T. 702-38).

In a decision dated May 25, 2005, the ALJ, noting that the period at issue in this case was from the date of the prior final decision, April 14, 1999, until the date his insured status expired, December 31, 1999, found that plaintiff was not disabled.  (T. 16-28).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on June 1, 2006.  (T. 8-11). Plaintiff's former counsel, the law firm of McMahon, Kublick & Smith, P.C.,

---

[1] In his 2003 application, plaintiff claimed that his alleged disability began on November 19, 1994, although his previous application in 1998 alleged an onset date of November 19, 1993. (T. 97, 109).  However, during the hearing, plaintiff amended his onset date to be that of November 19, 1993, as alleged in his prior application.  (T. 705-06).  The ALJ accepted the revised date of the alleged onset of the disability.  (T. 17).  Notwithstanding, the court notes that although plaintiff claimed that he stopped working on November 19, 1993 due to a back injury and "some mitigating circumstances surrounding separation with [his] wife at the time[,]" he returned to work from January until April 1994, when he lost his job due to "a DWI."  (T. 270, 710-11, 713-14).

[2] The court notes that the ailments which plaintiff claims caused his alleged disability in the current application are virtually identical to those asserted in his 1998 application.

[3] Defendant informs this court that this case was part of a "Disability Redesign Prototype case" and thus, the reconsideration stage was eliminated.  (Defendant's Brief, 1).

2

represented plaintiff at his hearing before the ALJ in February 2005[4], and before the
Appeals Council.  (*See* T. 702-38, 672-84).

## CONTENTIONS

Plaintiff is *pro se* and his former attorneys, McMahon, Kublick & Smith, are not
representing him in this action.  Plaintiff filed a complaint with this court but failed to
file a brief as required.  During the administrative proceedings, plaintiff's former
counsel filed a letter with the Appeals Council.  Neither counsel's letter to the Appeals
Council nor plaintiff's letter to the ALJ dated the same day her decision was rendered
sheds any light upon any specific contentions raised by plaintiff as to the nature of any
alleged errors committed by the ALJ.  (*See* T. 672-89).  The court assumes that
plaintiff generally asserts that the ALJ's decision is not supported by substantial
evidence, and that the ALJ erred in denying disability insurance benefits.

The defendant argues that the Commissioner's determination is supported by
substantial evidence in the record, and must be affirmed.

## FACTS

This court adopts the facts contained in the Commissioner's brief under the
heading "Testimonial and Other Evidence" on pages 2 and 3, and "Summary of
Relevant Medical Evidence" on pages 3 through 10, to the extent that those facts are
consistent with the facts stated in this Report-Recommendation.

The record shows that plaintiff claims disability from 1993, but he never
appealed the April 14, 1999 denial of benefits.  The record further shows that plaintiff

---

[4] Plaintiff's counsel was hired the same morning the hearing was conducted.  (T. 703).

worked between January and April 1994 (T. 713) despite his claim that he could not work after a back injury in November 1993 (T. 240-42).

## DISCUSSION

### 1.   <u>Disability Standard</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner]

4

will consider him disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

**2.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support

the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

### 3.   **Residual Functional Capacity (RFC)**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945; *see Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).

An ALJ must specify the functions plaintiff is capable of performing, and **_may not simply make conclusory statements regarding a plaintiff's capacities_**. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, the ALJ determined that although plaintiff's limitations precluded the performance of his past-relevant work as a corrections officer, plaintiff retained the residual functional capacity to lift twenty pounds occasionally and ten pounds frequently, sit, stand, and walk for six hours in an eight-hour workday, and bend occasionally.  (T. 26).  The ALJ also found that plaintiff "retained the ability to understand, carry out and remember simple instruction, respond[] appropriately to supervision, coworkers, and usual work situations and deal[] with changes in a routine work setting."  (*Id.*)  Accordingly, the ALJ opined that plaintiff could do light work.[5]

In making the determination, the ALJ first stated that plaintiff's major depression, personality disorder, degenerative joint disease of the left shoulder, right thumb arthritis, and degenerative disc disease of the lumbosacral spine with

---

[5] Light work involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

radiculopathy were severe impairments but did not meet or equal a listed impairment. (T. 21). The ALJ found that plaintiff's gastrointestinal issues and hypertension were not severe medical impairments.[6] (*Id.*) This finding is supported by a treating gastroenterologist who stated that plaintiff's gastrointestinal symptoms are "functional." (T. 409).

Then, weighing the medical evidence, the ALJ relied upon the April 1999 physical RFC assessment made by Dr. Sury Putcha, a state agency medical consultant, and found that it was consistent with an ability to perform a full range of light work.[7] The ALJ found the assessment to be supported by objective medical evidence. (T. 22). In that report, Dr. Putcha opined that plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently and sit, stand, and walk for six hours in an eight-hour workday. (T. 346). Dr. Putcha also stated that plaintiff was limited in his ability to push and/or pull in his lower extremities but that he had no postural, manipulative, visual, communicative, nor environmental limitations. (T. 346-49). The ALJ then reviewed other medical evidence of examining physicians and state agency medical consultants to find that this evidence was not inconsistent with the RFC of the non-examining physician.

---

[6] The ALJ's findings are supported by substantial evidence in the record. (*See generally* 306, 416-17, 482, 553, 560). Furthermore, the court notes that plaintiff testified that his colon condition did not become severe until 2004, well after his insured status expired on December 31, 1999. (T. 727). Additionally, there is no evidence prior to the expiration of the insured status date that plaintiff either suffered from or was diagnosed with hypertension.

[7] In plaintiff's previous 1998 application, Dr. Putcha explained the determination of a finding of no disability and stated that plaintiff retained the ability to do light work and that Rule 202.14 in the Medical-Vocational Guidelines directed that plaintiff was not disabled. (T. 36-37).

The ALJ noted that the January 1999 opinion of Dr. Berton R. Shayevitz, a state agency consultant, was inconsistent with his own findings, the medical evidence in the record, and mainly based upon plaintiff's subjective complaints.  (T. 21-22, 322-25). Dr. Shayevitz stated that plaintiff could walk no more than two blocks, stand for only five to ten minutes, sit for less than thirty minutes, lift and carry less than ten pounds, and that he could climb a flight of stairs and bend with difficulty.  (T. 324).  These statements were based on plaintiff's statements to Dr. Shayevitz.  Dr. Shayevitz further stated that plaintiff could dress and bathe himself, he could walk on heels and toes, station was normal, no assistive devices were used at the examination although plaintiff stated he used a cane, range of motion of the cervical spine was normal, there was no direct cervical or paracervical tenderness or spasm, and the biceps, triceps, and brachioradialis muscles were equal and active.  (T. 323).  He also found that plaintiff had full range of motion of the upper and lower extremities, Tinels sign was negative, grip strength was 5/5 on the left but 3/5 on the right, fine manipulation was less than normal, there was no SI joint or sciatic notch tenderness in his spine, straight leg testing was positive on the right but negative on the left, and there was no sensory loss or atrophy.  (T. 324).  There is substantial evidence in the record to support the ALJ's conclusion about Dr. Shayevitz's opinion.

The ALJ further stated that the February 2005 medical source statement of Dr. Richard Zogby, who examined plaintiff for his workers' compensation claim,[8] was

---

[8] Plaintiff testified that he settled a workers' compensation claim in December 2004 and applied for unemployment benefits, although he could not remember how things transpired.  (T. 716-17).

9

inconsistent with the medical evidence and lacked probative value since it was based on the history of the injury from 1993 and office notes that post-dated the date plaintiff was last insured, December 31, 1999.  (T. 22).  Dr. Zogby opined that plaintiff could lift and/or carry less than ten pounds frequently or occasionally, stand and walk for less than two hours in an eight-hour workday, sit for less than six hours in an eight-hour workday, never climb, balance, kneel, crouch, crawl, or stoop, occasionally reach and handle, and that his ability to push and pull was limited in both the upper and lower extremities. [9] (T. 577-80).  This assessment is contrary to medical findings made by Dr. Zogby up until the date of the report.  For example, in May and June *1998*, Dr. Zogby stated that plaintiff could lift no more than *twenty-five pounds* in addition to the restrictions placed upon the amount of time he could walk or sit and bend.  (T. 401-02).  Then, in June, July, and September *2003*, Dr. Zogby found that plaintiff's station was normal, he had normal lordosis with level pelvis, straight leg raising test was negative bilaterally, motor exam of both lower extremities was 5/5, and active and passive range of motion was full and painless bilaterally.[10]  (T. 388,

---

[9] In an October 2004 letter, Dr. Zogby stated that plaintiff should lift no more than ten pounds, he should do minimal bending and twisting, and that he should alternatively sit and stand during the course of a workday.  (T. 551).  He also stated that plaintiff was able to use public transportation and that his prognosis was fair.  (*Id.*)

[10] Although Dr. Zogby found plaintiff to be totally disabled as he said he felt in 1998 on these occasions, it should be noted that disability standards under the Social Security Act differ significantly from those applicable under the workers' compensation laws.  (T. 388, 398, 400, 403); *Crowe v. Comm'r of Soc. Sec.*, No. 01-CV-1579, 2004 WL 1689758, at *3 (N.D.N.Y. July 20, 2004) (Sharpe, J.) (citing *Gray v. Chater*, 903 F. Supp. 293, 301 n.8 (N.D.N.Y. 1995) ("Workers' compensation determinators are directed to the workers' prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act.")).  Thus, his ultimate conclusion of disability would be inapplicable to this case.

455-56, 459, 462-63, 465).  In December 2003 as well as March, September, and December 2004, Dr. Zogby made virtually ***the same findings*** and noted that plaintiff's station was normal, he had normal lordosis with level pelvis, straight leg raising test was negative on the left but positive on the right, motor exam of both lower extremities was 5/5, and active and passive range of motion was full and painless.  (T. 445-46, 549, 584).  Moreover, during the relevant period at issue in this case, Dr. Zogby examined plaintiff on only one occasion in February 1999 and not again until April 2003.  (T. 387-88, 396-97).  There is substantial evidence in the record to support the ALJ's conclusion about Dr. Zogby's opinion.

Additional evidence supports the ALJ's decision.  A few days after plaintiff's accident on the job on November 19, 1993, a Magnetic Resonance Imaging (MRI) taken of his lumbosacral spine showed no evidence of fracture, dislocation, or other bony abnormality and the intervetebral disc spaces were well maintained.  (T. 210).  His left shoulder showed degenerative changes with spur formation but Dr. Charles Moehs, working at A. L. Lee Memorial Hospital, stated there was full range of motion of the shoulder and there were no neurological deficits in either arm.  (T. 210, 213).  Approximately ten days after the accident, on November 29, 1993, Dr. Nak K. Shim found that plaintiff had full range of motion of his neck, shoulder elevation was good but slow, straight leg raising was full, forward flexion was limited, he could stand straight, x-rays of the shoulder showed no evidence of new bony injury, and x-rays of the lumbosacral spine showed straight alignment, some atrophism of the facet joints at L5-S1, a normal lumbar lordotic curve, no bony deficits, and maintained disc spaces.

(T. 569).

Then, in November 1994, Dr. Abdul Razaq stated that plaintiff was free of acute pain, there was mild tenderness at L4-5 and over the paravertebral muscles on the right, flexion was mildly painful, lateral bending and extension was unremarkable, straight leg raising was negative, and there was no sensory or motor deficit.  (T. 565). In December 1995, Dr. George Ang reported that plaintiff's shoulders were symmetrical, there was full range of motion of the left arm, there was good muscle tone, and no atrophy, joint effusion, edema, or motor and sensory deficits.  (T. 308). Thereafter, in August 1996, although a note was made that there was mild disc protrusion at L2 to 3 and L4 to 5, there was no significant foraminal narrowing and Dr. Ang stated that plaintiff was ambulating without difficulty and he was also able to drive without difficulty.  (T. 306, 310).

Subsequently, in July 1997, Dr. Douglas Wilson stated that straight leg raising was negative bilaterally and that reflexes were 2+ at both knees and 1+ at both ankles. (T. 297).  In August 1997, Dr. Patrick Connolly, an orthopedic surgeon, found that plaintiff's gait was without signs of myelopathy, there were minimal signs of hypersensitivity, he had a normal neurological exam, patella tendon, ankle jerk, and deep tendon reflexes were intact, there was normal strength of the lower and upper extremities, a cranial nerve exam was normal, and cervical spine motion was eighty percent normal.  (T. 314-15).  Dr. Connolly stated that surgical intervention was not warranted and that plaintiff should focus on fitness.  (T. 315).  In June 1998, Dr. Elliot Rodriguez reported that plaintiff had some tenderness to palpation over the

12

temporoparietal region but that his neck was supple, a neurological exam revealed good coordination, he had 5/5 strength, sensation was intact, and gait was stable. (T. 316).

In January 1999, x-rays of plaintiff's left shoulder showed some spurring and osteoarthritic changes and x-rays of his lumbar sacral spine showed minimal disc space narrowing at L5-S1 but no spondylolisthesis or spondylolysis and that the heights of the vertebral bodies and lumbar lordotic curvature were maintained. (T. 326). Also in January 1999, Dr. August R. Buerkle, Jr., stated that plaintiff's grip strength on the right side was ***twenty-five pounds*** and ***sixty-five pounds*** on the left side. (T. 382). Then, during plaintiff's incarceration,[11] x-rays taken of plaintiff's lumbar and upper sacral spine in March 2000 revealed no evidence of fracture, sublaxation, spondylolisthesis, or spondylolysis. (T. 647). It also showed that intervertebral disc spaces were preserved and that plaintiff had a normal lumbar spine. (*Id.*) Plaintiff had also been complaining of right knee pain to medical staff at the correctional facility and x-rays taken showed no fracture, sublaxation, dislocation, or significant arthritic process. (T. 648). The x-ray further revealed that suprapatellar joint effusion was not demonstrated and that the right knee was normal. (T. 616-17, 648).

Subsequently, in May 2003, Dr. Buerkle stated plaintiff's grip strength was twenty-five pounds on the right and fifty-five pounds on the left, he could make a fist

---

[11] Plaintiff testified that he served time in prison from April 1999 until March 2003 for a conviction of first degree rape and that he was on parole. (T. 711-12); *see* Inmate Information, http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (last visited Feb. 27, 2008).

and fully open his hand, he had normal motion pronation/supination and dorsi and palmar flexion, and x-rays of the right thumb showed likely boney impingement of the trapezoid but no other abnormality. (T. 468). Dr. Buerkle also found there was no ligamentous taxity in the right knee, there was full range of motion, no pain at the extremes or effusion, and x-rays of the knee were normal. (*Id.*). On July 11, 2003, Dr. Buerkle reported that plaintiff had full extension of his knee, there was no effusion, he had good alignment and no tenderness, and flexion was 110 degrees. (T. 469). In September 2003, Dr. Buerkle opined that plaintiff had no effusion of his knee, no ligamentous laxity or McMurray's click, range of motion was from 0 to more than 110, and he had a good strong pinch to his index finger on the right. (T. 470).[12]

In December 2003, Dr. Saad Sobhy, a specialist in pain medicine, found that plaintiff's gait was reduced, there was no asymmetry, crepitation, erythema, or effusion of plaintiff's neck, spine, ribs, pelvis, and both upper and lower limbs, range of motion was moderately reduced at the lumbar spine and left shoulder, range of motion of all other joints was normal, muscle tone was normal, there was some tenderness of the trapezius muscles, he could tiptoe, heel walk, and squat without difficulty, and straight leg raising was positive on the right. (T. 575).

Thereafter, in November 2004, Dr. Buerkle stated plaintiff's grip strength was fifty pounds on the right and seventy-five pounds on the left. (T. 472). On December 29, 2004, Dr. Buerkle completed a physical medical source statement of plaintiff's

---

[12] Although plaintiff was diagnosed with arthritis of the right knee in October 2003, there is no evidence that the alleged onset of this condition occurred before the date his insured status expired. (T. 471). Moreover, in August 2004, a report showed a normal study of the right knee. (T. 480).

ability to do work-related activities.  (T. 473-76).  He opined that plaintiff could lift

and/or carry one hundred pounds occasionally and twenty-five pounds frequently and

stand and walk for six hours in an eight-hour workday.  (T. 473).  Dr. Buerkle also

stated that plaintiff's sitting was not affected by his impairment, he was limited in his

ability to push and/or pull in his upper extremities and reach from his right side, he

could frequently climb, balance, crouch, crawl, and stoop, and occasionally kneel but

that he had no limitations in his ability to reach, finger, and feel.  (T. 474-75).

　　While it is clear that plaintiff suffered from some physical limitations, they did

not foreclose his ability to do substantial gainful activity.  Furthermore, in regards to

plaintiff's mental limitations, the ALJ does not dispute that plaintiff has a mental

condition that may limit, in some capacity, his ability to work.  The issue is the extent

of that limitation and whether it precludes not only his past work, but any other

substantial gainful activity.  The record contains extensive notes from treating

psychologists that show plaintiff's problems with emotional issues that do not

necessarily interfere with his ability to work.  Based upon the objective medical

evidence in the record, plaintiff's mental impairments did not significantly undermine

his ability to do some work.

　　In rendering the RFC determination as to the mental limitations, the ALJ found

the opinion of Dr. Ivan Fras, a state agency medical consultant, to be supported by

objective medical evidence.  (T. 24).  On April 3, 1999, Dr. Fras completed a

Psychiatric Review Technique Form and found that plaintiff had been diagnosed with

depression and adjustment disorder.  (T. 356).  He reported that plaintiff had slight

restrictions of activities of daily living and difficulty in maintaining social functioning and often had deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. (T. 360). Dr. Fras also found there was insufficient evidence to determine if there were episodes of deterioration or decompensation. (*Id.*) The same day, Dr. Fras also completed a Mental RFC Assessment. (T. 362-64). In examining twenty categories of mental functioning, Dr. Fras found that plaintiff had moderate limitations in eight categories but was not significantly limited in the other twelve categories. (*Id.*) Specifically, Dr. Fras stated that plaintiff was not significantly limited in his ability to understand, remember, and carry out very short and simple instructions, and was only moderately limited in his ability to get along with co-workers and peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. (*Id.*)

The ALJ's conclusions regarding plaintiff's mental limitations are further supported by other evidence in the record. In 1994, Dr. Alan Chamberlain, plaintiff's treating psychiatrist, stated that plaintiff was oriented with no major psychopathology, he was over-productive and characterized by anger, he was logical, and there were no delusions. (T. 273). He was diagnosed with personality disorder and given a Global Assessment of Functioning (GAF) score of 70, which indicates the existence of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally means that the individual is functioning reasonably well and has some meaningful interpersonal relationships.[13] (*Id.*) In 1995, Dr. Suresh Patil found that

---

[13] The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health. DIAGNOSTIC AND

plaintiff was coherent and well organized in his thought processes, he did not have any hallucinations, delusions, or paranoid ideations, he denied suicidal or homicidal intent, sensorium was clear, and memory was fairly intact.  (T. 245).  Plaintiff was assessed a GAF score of 60, which indicates the existence of moderate mental health symptoms or moderate difficulties in social, occupational or school functioning, and it was noted that a score of 75 had been given in the past, which denotes that if symptoms are present, they are transient and expectable reactions to psychosocial stresses and that they show no more than slight impairment in social, occupational, or school functioning.[14]  (T. 246).

In January 1999, Dr. Michael Thompson stated that plaintiff was capable of maintaining himself independently in the community and doing simple household chores.  (T. 330).  He also stated that plaintiff was able to manage funds in his own best interests, he could care for his personal needs, and he could use public transportation.  (*Id.*)  Although Dr. Thompson opined that plaintiff was not psychiatrically stable to maintain himself adaptively in a work situation, as noted in a March 1999 evaluation by another doctor, plaintiff was awaiting trial for a rape charge and was suffering from anxiety, agitation, and depression.  (T. 330, 370, 372); *see supra* note 11.  The doctor from the March 1999 evaluation also stated that the court situation was overshadowing plaintiff's entire life but nonetheless gave him a GAF score of 70.  (T. 366, 375).

---

STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").

[14] *See* DSM-IV-TR 34.

Thereafter, on September 11, 2003, Dr. Bill Hines and psychotherapist Ron Lopez noted that plaintiff attended thirty-two session between May 1998 and May 1999.  (T. 425-31).  They stated that plaintiff's mood was depressed, his speech was coherent, thought processes were clear, affect varied from sad to full range, there were no suicidal or assaultive ideations, and there was no paranoia, delusions, or hallucinations.  (T. 425)  They opined that they did not perceive him as an "SSI recipient suffering a mental health disorder."  (*Id.*)  Then, in June, July, September, October, and December 2003 as well as March and September 2004, Dr. Richard Zogby stated that plaintiff was oriented, his mood was normal, and affect was appropriate.  (T. 445, 449, 452, 455, 462, 465, 549).  Additionally, in December 2003, Dr. Sobhy stated that plaintiff was oriented and appropriately alert, he had a good attention span, and mood and affect did not show clear evidence of agitation or anxiety.  (T. 575-76).

Based on the record containing evaluations and assessments regarding plaintiff's physical and mental impairments, the ALJ properly determined that plaintiff had the RFC to do light work with certain mental restrictions and the ALJ's RFC determination is supported by substantial evidence in the record.

## 5.   **Medical-Vocational Guidelines**

If a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is

disabled.[15]  *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  If the plaintiff's range

of work is significantly limited by her non-exertional impairments, then the ALJ must

present the testimony of a vocational expert or other similar evidence regarding the

availability of other work in the national economy that plaintiff can perform.  *Id.*  A

vocational expert may provide testimony regarding the existence of jobs in the

national economy and whether a particular claimant may be able to perform any of

those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176,

180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

      In this case, the ALJ determined that plaintiff could not perform his past

relevant work as a corrections officer.  (T. 26).  Thus, the burden shifted to the

Commissioner to show that there were other jobs existing in significant numbers in the

national economy that plaintiff could perform.  In rendering a decision, the ALJ stated

that plaintiff's non-exertional limitations did not significantly narrow the range of

work that plaintiff could perform.  (T. 27).  Thus, taking into account plaintiff's RFC,

age, education, and prior vocational experience, the ALJ utilized the Medical-

Vocational Guidelines and found that Rule 202.14 directed a finding of "not

disabled."  (*Id.*)

---

[15] Non-exertional limitations refer to limitations affecting the claimant's ability to meet
the requirements of a job other than strength demands.  20 C.F.R. § 404.1569a(c).  This includes,
*inter alia*, limitations or restrictions in functioning due to nervousness, anxiety or depression,
maintaining attention or concentration, understanding or remembering detailed instructions, and
performing manipulative or postural functions such as reaching, handling, stooping, climbing,
crawling, or crouching.  *Id.*; *see also* S.S.R. 83-14, 1983 WL 31254, at *1, *Program Policy
Statement–Titles II and XVI: Capability to do Other Work – The Medical Vocational Rules as a
Framework for Evaluating a Combination of Exertional and Nonexertional Impairments* (S.S.A.
1983).

As discussed above, plaintiff experienced some exertional impairments.  *See* pp. 8-14.  However, none of his non-exertional impairments significantly diminished the range of work allowed by his exertional impairments.  *See* pp. 8-14.  In plain words, plaintiff's non-exertional impairments did not narrow his possible range of work as to deprive him of a meaningful employment opportunity.  Accordingly, the ALJ properly utilized the Medical-Vocational Guidelines and there was substantial evidence in the record to support such use.

**6.    Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ

need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

This court has examined the record and finds substantial evidence to support the ALJ's credibility finding as discussed in her decision. (T. 25-26). Plaintiff has given inconsistent statements about why he was no longer able to work. Plaintiff has also given inconsistent statements about his ability to conduct certain activities and handle activities of daily living. This is demonstrated, in part, by findings from his treating physician showing that he had a greater physical and postural abilities than claimed.

Plaintiff testified that he was working as a corrections officer in a class A maximum security prison when he injured his back on the job in November 1993. (T. 710, 714). He stated that he stopped working on November 19, 1993 due to his back

injury and "some mitigating circumstances surrounding separation with [his] wife at the time[.]"  (T. 710-11).  However, ***plaintiff returned to work from January until April 1994***, although he claimed that he could not remember that period and it was unclear how the job ended.  (T. 713).  His treating psychologist, Dr. Chamberlin, noted that plaintiff lost his job on this occasion due to "a DWI[,]" not because of claimed difficulties with his ex-wife.  (T. 270, 714).

Furthermore, although plaintiff claimed he could no longer work after his back injury in 1993[16] and that he had trouble bending, he lost a fingertip moving a washer in October 1996, which plaintiff would have been unable to do if his back impairment was as severe as asserted.  (T. 386).  In his report of November 20, 1996, Dr. Buerkle stated that plaintiff "may return to regular work on 12/2/96.  He must have the index finger covered."  (T. 385).  Plaintiff further testified that he had limited grip strength in his right hand, that he wears a support, and that he had difficulty lifting anything with that hand.  (T. 722-23).  Nevertheless, in January 1999, Dr. Buerkle stated that plaintiff's grip strength on the right side was twenty-five pounds and sixty-five pounds on the left side.  (T. 382).  Subsequently, in May 2003, Dr. Buerkle reported that plaintiff's grip strength was twenty-five pounds on the right and fifty-five pounds on the left, he could make a fist and fully open his hand, he had normal motion pronation/supination and dorsi and palmar flexion, and x-rays of the right thumb showed likely boney impingement of the trapezoid but no other abnormality.  (T. 468).

---

[16] In spite of plaintiff's argument that he could no longer work after 1993, Dr. Chamberlain's records from 1995 indicate that plaintiff continued to look for a job, and that plaintiff's "lawyer" was working on "getting the job back."  (T. 240, 242).

Then, in November 2004, Dr. Buerkle stated plaintiff's grip strength was fifty pounds on the right and seventy-five pounds on the left.  (T. 472).  Additionally, in December 2004, Dr. Buerkle opined that plaintiff could lift and/or carry one hundred pounds occasionally and twenty-five pounds frequently.  (T. 473).

Plaintiff also testified that he had trouble sitting, standing, walking, and lying back for any prolonged length of time.[17]  (T. 721-22).  However, Dr. Buerkle found that plaintiff could stand and walk for six hours in an eight-hour workday, plaintiff's sitting was not affected by his impairment, he was limited in his ability to push and/or pull in his upper extremities and reach from his right side, he could frequently climb, balance, crouch, crawl, and stoop, and occasionally kneel but that he had no limitations in his ability to reach, finger, and feel.  (T. 473-75).  Finally, although plaintiff stated he faced difficulties in his daily activities, Dr. Thompson opined that he was capable of maintaining himself independently in the community and doing household chores, managing funds in his own best interest, caring for his personal needs, and using public transportation.  (T. 330, 723-24).

Based upon a review of the record, the ALJ's finding that plaintiff was not completely credible is supported by substantial evidence and supports the ALJ's finding that plaintiff is not as limited as he states.

**WHEREFORE,** based on the findings in the above Report, it is hereby

---

[17] In December 1998, a representative from the Social Security Administration noted that although plaintiff was walking with a cane, he was observed walking up four flights of stairs to the Social Security Office since a fire on the twelfth floor of the Federal Building had caused the elevators to stop working.  (T. 126).  It was also noted that plaintiff was a very poor medical historian.  (*Id.*)

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and the Complaint (Dkt. No. 1) be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: April 22, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge